and Mr. Harrington. May it please the Court, the judgment in this regulatory taking action should be reversed. The trial court erred in each part of its analysis under Penn Central. It failed in considering offsetting statutory benefits, both in assessing the character of the government action and in assessing economic impact. It mistakenly fashioned a new fourth Penn Central factor and it incorrectly treated the preservation statutes as a permanent restriction on prepayment in assessing interference with investment-backed expectations. The Court should bear in mind two things in assessing CCA's claim. First, this action concerns a regulatory taking under Penn Central. It does not allege a per se taking under Loretto. This is important because CCA frequently invokes per se taking cases in its briefs and uses the language from physical occupation cases in discussing its claim here. Second, in Siena-Gaten, a seven-judge panel of this Court... Don't you hang a lot of your case on Tahoe-Sierra and isn't that a per se case? I don't believe we do hang a lot of our case on that, Your Honor. It is a per se case and, in fact, it is a particular case that says that you distinguish between per se taking cases and regulatory taking cases, that you have to be careful in applying holdings from per se cases in regulatory actions. But to the extent we're going to talk about an 81% diminution in value as opposed to an 18% diminution in value, didn't the genesis of that notion stem from Tahoe-Sierra and carry through to Siena-Gaten and now you'd like us to apply it in this case as well? Well, not simply Tahoe-Sierra, Your Honor. And Tahoe-Sierra does, when talking about the property interest that is to be considered as the denominator, if you will, in the economic impact figure, it says that you look at the property as a whole, and it said that it's improper to, in Tahoe-Sierra, they were splitting up into temporal segments, and the Court said you don't do that. You look at the value of the property as a whole when you are considering economic impact. But that is no different than what the Supreme Court said in the concrete pipe case, exactly the same principle. A similar principle is enunciated in Penn Central itself, and it is that line of cases that the Court took and said in Siena-Gaten that you apply that, and you have to look at the value of the property as a whole. The 81% figure you alluded to is one that uses a returns-based approach, exactly the approach that was considered in Siena-Gaten and rejected as inappropriate in Siena-Gaten. We're talking about the same approach here, and I'd add that it's important not to use that returns-based approach because the standard method of evaluating economic impact is a diminution in value sort of approach that considers the property as a whole. In order to have consistency across taking jurisprudence, you can't be using different methods, and the Court talked about that a little bit in Siena-Gaten, also talked about that in the second Rose-Aker decision about the danger of having multiple different tests and the misleading impression that you can get from that 81% sort of figure. So then do you think it's erroneous because Siena-Gaten allowed for two different tests, one that was based on market value at the time of the regulation, and then a separate one which seems to be based on a return-based approach, and your comment just a minute ago might have suggested that you thought it was inappropriate for the two tests available to establish takings. No, I'm not suggesting that. The two tests that are talked about in Siena-Gaten are the diminution in value approach. The 81% wasn't a property as a whole approach. It wasn't. As I understand the issue here today with respect to economic impact, the two choices are the 18%, which is what the government is arguing for, right? That's exactly right. The 81% figure is neither of the approaches that the Court mentioned in Siena-Gaten. Both of those approaches look at the value of the property as a whole. The 81% approach does exactly what the Court said you cannot do in Siena-Gaten, which is break things into temporal parts and then look at returns at a particular period of time against what was, in this case, a benchmark 15% mortgage-backed security. I understand CCA to have argued a number of things, which probably an in-bank panel of this Court would have to decide. I mean, they're challenging the contract decisions under Siena-Gaten 4, I think it is, the privity issue, I think. And then I understand them also to be challenging whether or not the 81% diminution, whether Siena-Gaten was correct. I mean, Siena-Gaten 8 certainly suggested something like what they had concluded with the 81% number was the correct measure of or approach to the measure of damages, and Siena-Gaten came along and said, no, it's not. It wasn't argued by the government, and that's why it wasn't addressed, and so we can now do it. But do you understand them to be challenging that as well? Maybe we can't reach it at a panel level, it has to go to in-bank, or do you think they are not at all challenging that on appeal? I did not see their argument at seeking an on-bank review of that aspect of Siena-Gaten. Obviously, the Court is entitled to do what it chooses to do in terms of on-bank review, but I did not read their brief as requesting that. The only request that I saw for an on-bank consideration was on the breach of contract decision from Siena-Gaten 4, which is a very distinct issue. Now, with respect to the difference between the 18% and the 5%, the 18% is computed without regard to the offsetting benefits. That's exactly right. And the 5% is the government's view as to what the figure would be with the offsetting benefits that we said should be included in Siena-Gaten. Was there any evidence put in by CCA as to what the figure would be if you took into account offsetting benefits? No. They did not introduce evidence on remand or in the initial trial about the value of offsetting benefits. They have relied simply on the argument that offsetting benefits are too speculative to consider. Is that a finding of fact by the lower court that we have to give deference to, that they're speculative? No, it is not. And the reason that I say that is because if you look at the history of this case, and you look at what the Court said in Siena-Gaten, the Court found in Siena-Gaten that the statutory benefits were specifically included as a direct benefit to project owners as part of the same statutes that we're talking about. But the Court in Siena-Gaten didn't put a value on those. No. Didn't say that the value was anything other than speculative. It just said you have to consider these. Well, the Court said, and I can quote, they said that the statutory scheme afforded offsetting benefits, quote, which were specifically designed to ameliorate the impact of the prepayment restrictions, unquote. And it also said that these benefits, and here's another quote, quote, must be considered as part of the takings analysis. Weren't those benefits rejected as relevant by the Court of Federal Claims decision that we were reviewing in Siena-Gaten on the same ground, that is that they were speculative and uncertain? That's exactly right. So in Siena-Gaten, presumably, we were rejecting that determination by the Court of Federal Claims that they shouldn't be taken into account because they were speculative and uncertain. That's exactly right. The Court in the Siena-Gaten 9 decision, which was on appeal, had rejected the statutory benefits, had refused to consider them on the very grounds that they were uncertain, that they were speculative. But that was different. They just refused to consider them outright. They didn't do any factual analysis of them. I mean, you're not suggesting that this Court did fact-finding with respect to the value of those benefits in Siena-Gaten, are you? No, I'm suggesting that the Court found, based on the record in that case, that there was a benefit. They didn't quantify it, but found that there was a benefit that, in fact, was provided. And in this case, the lower court analyzed the benefit, her testimony, and said that the government's proofs still left the conclusion that they were speculative. Well, I've got two things to say about that. One, the Court didn't find—the Court rejected considering them because they were speculative, but the Court didn't find—well, let's go back to what we're talking about here and talk a little bit about the trial record. Even under a clearly erroneous standard, you lose on this because the property's owner, Mr. Norman himself, said we could sell under the preservation statutes. The director of HUD's preservation division testified that buyers were prevalent and that he was unaware of any instance anywhere in the United States where an owner was unable to find a willing offeror. So you believe a property owner is required to sell even if that's not what they purchased the property for? No. The reason that you don't—this is not like mitigation of damages. Here, economic impact is one of the prongs to establish that a taking has occurred. It's part of the liability determination. And this Court in Forest Products and in Siennica 10 said that with respect to each Penn Central factor, the burden rests on the plaintiff. The Court specifically said that with respect to economic impact in Siennica 10. But the burden relies on the plaintiff and they established 18%. If the government wants to suggest that the number should be offset by other benefits, why isn't the government's burden—we're not talking about the burden of persuasion, but just the burden of proof—why hasn't it switched to the government to establish that the 18% number is not the accurate number? It should reflect a reduction for these other benefits. Well, what the Court found in Siennica 10 was that you look at the statutes as a whole and their impact as a whole on the owner. The impact of the statutes as a whole has to take into account not merely restrictions and detriments, but benefits. Well, it has to take it into account, certainly, when the evidence is presented. There are many examples of this in the law. We have patent law obviousness. There are four prongs of the test, all of which may be considered. But the person who's moving for obviousness doesn't have to bring forth all of the contrary evidence that falls on the opposer to do. It has to be considered when presented. It can't be rejected when presented. But why does that mean that it's always their burden to produce the evidence that would help your case? Where it's part of the fundamental liability determination. I guess your answer to that would be we did produce evidence. We did meet a burden of production, if there is one. But once we've met the burden of production, the burden of proof on this issue, as the cases have said, remains with the plaintiff. And we absolutely did, because it was the government's evidence that established that 5%, not CCA's evidence. They didn't produce any evidence whatsoever. And I'd add that even if we're looking at an 18% economic impact, which disregards the preservation statute's benefits, and therefore necessarily has got to overstate the total impact. An 18% economic impact is not close to what this court has found is necessary, or any court has found is necessary to establish a regulatory taking. What about the trial court's specific findings of fact as it related to the timing of a potential sale? Didn't the trial court make findings of fact that said that the potential sale couldn't occur until 1996, and that therefore that would reduce any benefit or economic benefit to CCA? What the trial court found was, the trial court completely discounted the sale option under a LIPRA. And that is where the mistake lies. The trial court then went and looked at LIPRA, the second statute. Now, CCA was eligible to proceed under both, or actually they had to elect, but they could proceed under either. But a LIPRA was available. The trial court's finding about timing related to LIPRA, so the timing findings related to the separate statute. Under a LIPRA, the timing testimony of Kevin East is in the record. That's the only evidence about timing under a LIPRA. And he said, he was the director of HUD's preservation division nationally, well-versed in this. And he said that sales under a LIPRA generally took 12 to 18 months. Right, but you're saying that we should adopt your contrary evidence, even though there was specific fact finding by the lower court. Yes, that was part of their burden. And frankly, based on the evidence in the record that we cite to, and the absence of contrary evidence, the court's decision would be clearly erroneous. But, frankly, the court doesn't have to decide on us finding a 5% economic impact to rule in our favor in this case. 80 to 90% economic impact is what is typically required. And no court, since the decision in Penn Central 35 years ago, has found a regulatory taking where economic impact did not exceed 50%. CCA has stipulated that the economic impact in this case is no more than 18%. So is it your view that CNEGA 10 overruled the specific findings in CNEGA 8 that said that you don't need something approaching 100% in order to be a regulatory taking? That even a far lesser amount could be sufficient? The trial court found that in this case, in assessing the takings claim. Neither CNEGA 8 nor CNEGA 10 found such a thing. To the contrary, both cases said that you have to show a, I think the language is, the case law has required there being a showing of a significant economic loss or serious economic loss, some phraseology along those, as a threshold matter to recover in a regulatory taking case. So the constitutional principle turns on percentages? Well, if you look at what the Supreme Court said in Lingle, it said that the purpose of the Penn Central factors is to identify regulatory actions that are functionally equivalent to the classic taking where the government has directly appropriated private property or ousted the owner from his domain. And the court goes on to say that the Penn Central analysis turns in large measure on economic impact. We think that's right because without an economic impact exceeding 50%, probably on the order of 80 to 90%, you're not talking about a regulatory action that is akin to a direct condemnation. And that's the whole point of Penn Central, is to find serious cases where the regulations affect the value of property so that it's not an ouster of the owner. And Sienega 8's statement that this is akin to a physical taking, you think that's been overruled by Sienega 10? I would not use the term overruled. The court talks about that specifically in the Sienega 10 decision. If you look at what the court explains in Sienega 10, it says that there were three elements of the Sienega 8 decision that applied across the board. The other aspect, and none of those three elements are what we're talking about here, in terms of character, for instance. What it said was that the other aspects of Sienega 8 were based on specific arguments made about specific plaintiffs. And so they do not apply broadly. And if you look at Sienega 8 itself, what it did was it ruled in favor of four model plaintiffs. But with respect to the other, I believe it was 38 projects in that case, it did not rule in favor of the plaintiffs. It remanded, said develop the facts, and will entertain your claim. I understand that, that's obvious. But the statements that they made with respect to the fact that by preventing property owners from using the property in the manner in which they chose to use it, even for a limited period of time, the court specifically said that that was akin to a physical taking. Did it not? It uses that language. And that's not different from plaintiff to plaintiff. That is something that was based on the arguments that were made, or actually the lack of arguments that were made by the government in Sienega 8. And the court made that clear when it only applied certain factual findings in, well, when it only ruled regarding four model plaintiffs in Sienega 8, allowed the other claims to go forward. And when it expelled out exactly what its view of Sienega 8 was in Sienega 10. I'd note just in passing that the three judge panel in Sienega 8 was in fact part of the seven judge panel in Sienega 10. I don't think that that is necessarily decisive, but the same judges that were involved in Sienega 8 were also writing and on the panel that rendered the Sienega 10 decision. In Sienega 8, if I recall correctly, the government didn't argue that this was comparable to rent control. That's correct. Which is now part of your argument. Exactly. That here what we're talking about is that the fundamental character of this, the fundamental effect of this, putting aside benefits, is that the owner was unable to raise rents from their current rents unilaterally to a market rate rental for a period of a few years. And that in and of itself is very similar to what you're talking about when you're talking about rent control. There's some limit on the ability to raise rents for projects up to a market level. And it's that difference in the rents that resulted in the stipulated 18% economic impact. Again, an economic impact at a level that does not support. Let me ask you one more question that goes back to Sienega 8. If we were to take the plaintiffs there and use the methodology, the calculation methodology that Sienega 10 dictates, it would come out to be closer to 18%, would it not? You're talking about the four model plaintiffs? Yes. You know, I cannot say, Your Honor. I am confident it would be lower than the 96, 97, 98%. It's pretty close to the 18%, isn't it? You know, I really can't say. It would be substantially lower than the 90% level. So your view would be that the government simply didn't make the right arguments in Sienega 8, and all of those plaintiffs shouldn't have gotten a windfall? I hate to say that we didn't make all the right arguments in Sienega 8, but given how things turned out in Sienega 10, I think that that's clearly the case. But clearly, under your current analysis, you believe that those four plaintiffs would lose for the same reason that you think this plaintiff should lose. I think that's likely. Okay. Any other questions? Thank you, Mr. Ernie. We'll restore your rebuttal time. Thank you, Your Honor. Mr. Paul Baum. May it please the court. Every Supreme Court case and every Federal Circuit decision on regulatory taxes- Let me ask you first about this rent control issue, which is raised here. Why isn't this similar to rent control? Some of the treatises at the time describing this program describe it as a form of rent control. I mean, isn't that the essence of what the government was doing by saying that you can't prepay the mortgage, that you're going to continue to be subject to rent control for this additional period that turned out to be five years? Why isn't that similar to rent control? It's not similar to rent control at all, Your Honor. As the Supreme Court's decision in Yee versus Escondido made clear, in the rent control context, the property owner may decide not to rent the property at all. It may put the property to a different use. It doesn't have to continue to participate in the program. In this case, CCA was party to a regulatory agreement, and it had to operate the property in the fashion that was dictated by HUD. So it's a completely different circumstance. But there are rent control cases like that, where the rent control system has required that you continue to operate the program, continue to lease the units to people. And those rent control programs have been upheld, right? In Yee, Your Honor, the- No, but I'm talking about court of appeals cases, right? There are court of appeals cases in which rent control programs have been upheld that required people to continue to operate the apartment building or whatever it is as a rent controlled building, right? Well, I'm not familiar with those cases that you're referring to. I do know that in Yee, the Supreme Court made clear that the rent control presents a different circumstance from the situation that we have here, where the property owner is required to continue to participate in the program. The Supreme Court in Yee stated quite explicitly that it would be a different case from the one that was before it if the property owner did not have the opportunity to withdraw from the rent control program. Which raises the question. In fact, there were opportunities to withdraw from the program here, which allowed a sale, or if a sale couldn't occur, you could prepay the mortgage and exit the program. So why isn't that similar, since those opportunities did exist? There was no obligation on the part of CCA to take advantage of the options that were presented. No, no, no, it's not a question of whether there's an obligation to take advantage of the options. Those options existed to exit the program. So while you say that Yee requires an opportunity to exit, I'm not sure that's true. But if it does, there was an opportunity to exit here, right? Well, exiting the program here would have required CCA to sell the property. That's not the circumstance that the Supreme Court was positing in Yee at all. It was simply positing the circumstance that the property owner in Yee could cease participating in the rent control program. Well, but you didn't have to sell the program. You had to offer it for sale. And if a sale wasn't accomplished, then you could exit the program. You could get out of the program without actually selling the property, right? If one went through that process, and a purchaser materialized over the course of this three-year schedule that was implicated as a result of this option, if the seller materialized, then the sale had to be made at that point. At full market price, right? That was the purported objective of the LIPRA procedure, yes. Right. And then if you couldn't get a sale at full market price, then you could withdraw from the program, right? If there was no purchaser or if there was no funding from the Congress, and we know that that occurred in a number of instances, then at a certain point, the property owner had the right to prepay the mortgage and exit the program, but nonetheless had to continue to charge the HUD-controlled rents for an additional three-year period. So in the situation that Your Honor is positing, we're talking about a five- to six-year period during which the HUD-level rents would be required to be charged to the tenants. And what findings did the trial court make with respect to the likelihood of a sale or with respect to whether or not the sale option was a meaningful one? The court did exactly what it was told to do in Siena-Gaten and it looked at these options very carefully and it found specifically that the opportunity to prepay and sell the property was speculative in this case. There was no assurance, as the court observed, that a buyer would materialize. All that was present in this case was an indirect expression of interest from one unidentified potential buyer that came to Mr. Norman through the party that was servicing the mortgage, but it didn't go anywhere. What about the fact that the government says that there's been no instance identified in which someone wanted to sell in which a buyer wasn't found? Well, that's the government's argument, but the court below... It's evidence, right? The court below specifically found... That's evidence, right? That was the government's evidence. There was testimony to that effect from Mr. East, but... And there was no contrary testimony, right? Did you present any contrary testimony on that point? On that specific point, no, Your Honor, but the court analyzed the evidence very carefully and found that in this case all that happened was, as I said, a single indirect expression of interest from a possible purchaser. The court then went on to find, specifically with respect to the New Orleans market, that there were three property owners who had plans of action approved by HUD and then there was no funding for those plans, so at the end of the day they were not implemented. But if there was no funding, then you could withdraw from the program, right? Well, at that point, after having been through a three-year process, one can then prepay and then have the privilege of charging HUD-regulated grants for an additional three years. But the Court of Federal Claims did not take into account the fact that if funding were unavailable, you could withdraw from the program. I'm quite certain that the court below was well aware of and noted that element... Where did the court recognize that you could withdraw from the program if the funding wasn't available? I believe that when the trial court is explicating the procedures that were available under LIPR that that was noted. No, but I don't think it was. I mean, if you can show me where it was. He didn't seem to take account of the fact that if the funding was unavailable, you could get out. Well, I'm not recalling specifically now. I thought that the court, in explicating the statute, noted that point. We can go back and check and he either did or he didn't. But the judge did consider all of the evidence and he made specific findings that in this case... But the point is, that doesn't depend on the individual facts. If there's no buyer, if there's no funding, in either event, even if the court were right about it, there's no buyer, there's no funding, you can still get out. But that's the ground for being able to get out is that you can't sell it or there's no funding to promote a sale. Your Honor, that process would result in an even longer period during which the rents were tied up. But you could get out. I mean, there's no question. There's nothing speculative about the ability to get out. That's what the statute and the regulations say. If you can't find a buyer or you can't get funding, you can get out. The property owner could get out eventually under hope. When that legislation was passed, it cut short the permanent taking that LIFRA had established. But in terms of the LIFRA and LIFRA, there's nothing speculative, is there, about the ability to get out if you can't find a buyer and you can't get funding. You can get out. You may have to keep the rents in place for three years, but there's nothing speculative about the ability to get out, right? First of all, with respect to OLIPA, Your Honor, there is nothing in the statute and there is nothing in the regulations that sets forth any type of process or procedure for selling the property and getting out of the program. The court looked at that issue very closely and made specific findings as to that as well. Well, you don't make findings as to what the statute says. Well, the court observed what the statute said and But it's true that under LIFRA, you had an absolute right to get out. Not under OLIPA, absolutely not, Your Honor. Under LIFRA, if one went through the process of getting appraisals and so on and so forth, which the court knows well, and at the end of that two and a half to three year process if there was no buyer, at that point there was a right to prepay, but you then nonetheless had to pay, had to charge HUD regulated rents for the next three years. But there's nothing speculative about the right to get out. It may be that you have to continue to fix the rents to the HUD level for three years, but there's nothing speculative about the right to get out of the program. What the court found was speculative, Your Honor, was attaching any type of value to what this option might produce. I don't see that the court considered the right to get out of the program. And Professor Dickey, the government's own expert, himself said that where these options have not been exercised, where somebody has not filed a plan of action, gone through the process and actually received the benefits, that simply looking at it in the way that we're discussing it right now, Professor Dickey, their expert, said that the value was speculative. And that's fully my... All of this really goes to whether the number should be 18% or something less than 18%, right? Or 5%, yes. But, I guess my question to you is, what cases exist that would suggest something at the level of 18% diminution in value is enough under the Penn Central? Well, let me answer that in two ways, Your Honor. First of all, the Penn Central test is an ad hoc, highly fact-based test in which there are three elements, all of which have to be balanced. And in Kaiser-Ettner and in Lingle, the Court put preeminent emphasis on the fact that the right to exclude, a fundamental property right, is what was at issue. And so the balance has to alter depending on the character of the taking or the investment-backed expectations. But, turning specifically to the numbers, the 81% impact that was previously discussed in the earlier history of this case is an economic impact that is concentrated in the five-year period of the taking. That's what that represents. We rejected that approach in Sienega 10, right? Your Honor. Did we reject that approach in Sienega 10, specifically? The Court in Sienega 10 said that the lifetime value of the property needed to be considered. And we specifically rejected the approach that led to the 81% calculation, right? Yes. I wouldn't say that it was specifically rejected as such. I would say that the Court below was directed to take into account We specifically considered that approach that led to that's not a correct approach, right? In the sense that the Court directed that the lifetime impact be considered that's correct. And that's what led to the 18% figure not considering the offset. And my point, Your Honor, is that if the 81% impact concentrated in the five-year period is mathematically equivalent to this 18% or so impact in relation to the lifetime value of the property? Don't talk over me. Suppose we say that the approach that leads to the 81% calculation was rejected. Then you end up you contend that the right figure is 18%, correct? 18% is the impact when you look at the lifetime value of the property. But when you're talking about real estate and you're talking about the infinite life of real estate and the infinite income potential that a real estate property can produce, you will never have a regulatory taking where the duration of the taking is five or six years and produce an economic impact over the lifetime of the property on the order of 60, 70, or 80% that the government is suggesting. So this argument, though, doesn't this argument really isn't what you're arguing now an argument that would be appropriate before the in-bank court but not before the panel because I mean the case Siena-Gaten is exactly on point. It's exactly these sorts of facts and it rejected that approach. You're saying that was wrong and maybe I'm sympathetic but the problem is it's binding precedent and so the 18% impact is the only impact that we can really consider. And that's why my question to you was what cases would substantiate a finding of a takings with an 18% impact? I think the 18% impact has to be viewed as the level of impact that results when the lifetime value of the property is considered and you can't take cases that look to a 70, 80, or 90% impact when we're talking about either a permanent taking or where the impact is evaluated during the temporary period of the taking and simply transpose that 70 or 80% rule to the circumstance where the lifetime value of the property is being considered. You will necessarily produce a lower percentage. If, for example, if Congress passed legislation confiscating the net... Is the right figure that you lose? No, absolutely not, no. Why would you win if it's 18%? Well, because there are cases which where the particular deprivation in question has a character that is very severe or where the primary investment back expectations are of a particular sort, when you balance out the different factors, then the economic impact doesn't need to attain a 70 or 80% level. Look at the Kaiser-Ettner case as a good example. There, the court recognized that what was being taken was the fundamental right to exclude. It was a physical takings case. It was an easement. It was a physical takings case, right? It... It created a right on the part... It's not a physical takings case. Well, there's a physical taking dimension to it, but I don't think you can look at it solely as a physical takings case. It gave a right to certain... to the public to traverse a particular waterway. It was described as an easement. It certainly wasn't taking the entire property value or anywhere near... But see, that's the problem. I mean, the Supreme Court has said, when you have a physical taking case, I mean, you know, look at... I mean, even a tiny little part of the property, a physical takings case entitles you to damages, but in the regulatory context, you've got to have more. And while no court has ever defined exactly where the threshold diminution number should fall, so I'm sympathetic to hearing your arguments about why something as low as 18% ought to be enough. At the same time, I don't see cases below 50%, and most of them hover in the 80s and 90s, so it's very difficult for me to think that 18% is going to meet whatever that threshold is. I appreciate your point, Your Honor, but all of those cases, when we talk about 70 or 80 or 90%, those are measuring the impact that results either from a permanent taking, or they're measuring the impact which results during the concentrated period of the temporary taking. There's no case which says you can take that 70% impact that is felt over a five-year period of temporary taking and transpose it to a consideration of the lifetime value of the property and say you have to have the same 70% impact. I'm not understanding how you're trying to distinguish the permanent takings ones, because I actually see those as hurting you, not helping you in the following way. 18% permanently seems worse to me than 18% over five years. So the idea that all of those cases required 70 to 80% when it was temporary actually seems to suggest to me maybe you should have to show more than 70 or 80% if it's temporary. So I'm not sure why your distinction actually helps you. What I'm trying to show is that on one side of the equation we have cases in which high levels of impact are being discussed, and they fall into two categories. The permanent case, the permanent takings, but also temporary regulatory takings where 70 or 80% was required. But there, when they're measuring the impact, they're focusing on what was taken during that five-year period or six-year period, whatever the duration is, and not with respect to any comparison to the lifetime value of the property. And what the government is advocating for here is, in effect, a rule that would do away with temporary regulatory takings because when you have real property, you will never – it's mathematically impossible – you will never have a taking on the order of 70, 80, or 90% if the duration of the taking is five or six years. It's just not possible. All right. Thank you, Mr. Palmo. May it please the Court, I note at the outset that counsel for CCA could not identify any regulatory taking case where less than a 50% economic impact has been sufficient to establish a taking. Well, has the issue ever really been analyzed in this context? I mean, has anybody looked at using the formula that we put forth, but then analyzing what that means in the context of a temporary taking? Absolutely. I mean, the cases that we are talking about that analyze economic impact have – the standard measure for analyzing economic impact has been the one that the Court enunciated in Siena-Catan. It's not a new standard. It's the one that is done when we cite many cases in our brief with higher economic impacts where there's no taking. All of those cases use the same sort of approach to economic impact that we're talking about here that results in an 18% economic impact. In a temporary taking context? Some yes, some no. I can't identify which cases are temporary, which cases are permanent. What this Court has said in Siena-Catan and what the Supreme Court said in First English is there is no difference in analyzing economic impact between – well, it said specifically in Siena-Catan that there's no difference in analyzing economic impact between a temporary and a permanent taking except that you take the duration of the regulatory restriction into account when you're analyzing the economic impact. So once that's taken – Justice Scalia said that in this context then the government can always cut off any regulatory takings argument by stopping the taking at some point? Your Honor, what I would say to that is that if in the character of the government action it was shown that there was some attempt to game the system, that might be something that the Court could properly evaluate in looking at character under the Penn Central rubric. We don't have that here. The legislative history is clear that the HOPE Act was enacted because the benefits being provided under the preservation statutes were costing too much. Congress spent millions of dollars – actually hundreds of millions of dollars in providing benefits directly to project owners affected by the preservation statutes. And it was that reason that the preservation statutes were dropped or repealed, not because there was a fear that there was going to be a taking. And that goes right back to why there is a problem with the trial court's analysis. You don't consider those benefits in assessing economic impact when you're looking at the 18% figure. But moreover, the benefits in looking at the character of the government action. At the same time, the Court is saying that the government is placing the cost of housing the poor on project owners. You can't ignore the fact that Congress was appropriating millions of dollars, many millions of dollars, as a direct benefit to owners when you're looking at whether or not the cost has been shifted onto those owners. But that's what the trial court did. So that's an error in analyzing character and it too is contrary to Sannegatan. Those benefits that you're talking about, those predated the original agreements. Those benefits were part of the original agreements and part of the inducements to enter into these contracts in the first place. Let me be clear, Your Honor. I'm not talking about the tax benefits here, which were the principal reason that people got into this. You think every plaintiff is the same in that regard because the trial judge here made specific findings that that was not the principal reason for these plaintiffs. Your Honor, when you are looking at interference with investment backed expectations, you're looking at reasonable investment backed expectations and what the court said you look at, let me go back to what this court said in Consolidated Edison in an en banc decision. It said that subjective intent is irrelevant. It said that again in Chancellor Manor. But what the trial court did in terms of factual findings is he made factual findings about the subjective intent of the project owners. He didn't base it on the objective evidence that we put in the record, such as the six private placement memoranda, such as our expert testimony, such as the learned treatise that was admitted into evidence that was written back in 1972 and speaks specifically about these kinds of investments. All of which uniformly says that these are tax shelters and that is the expectation for investors. You look at the prospectuses in particular. They say the main benefit is from income tax savings and they place a one dollar value on the ability to prepay 20 years in the future. One dollar. But it's not that this judge didn't consider those. He just found those not to be the driving force, right? He found those not to be representative of these particular plaintiffs. In fairness, you say he didn't consider them. He considered them. No, because He considered them in making this subjective determination, but he made no determination at all about the objective factor, right? That's exactly right. It's a question of whether you're looking at the subjective intent of Mr. Norman's uncle and father, which he made that factual finding about, and whether you're looking at the expectations of the industry as a whole, the objective expectation of the industry as a whole. And that is an important key element of looking at interference with investment-backed expectations. And the Court didn't find in fact, the Court specifically found that there were owners that had these tax shelter expectations in the industry. And then he created a second class of owners that he said was interested in long-term benefits. But there's not a single example, putting aside CCA itself, there's not a single example in the record of any project anywhere in the United States that had that kind of expectation. And that's not surprising because owners did not have to forego short-term tax benefits in order to obtain whatever benefit they might get in terms of a long-term benefit. Let me just ask you one more question on this issue though. The objective inquiry, which is important, but the objective inquiry is still supposed to be based on what an objective investor in the shoes of the particular plaintiff would do, correct? It's not objective in the sense that you remove it from the actual circumstances, correct? No, you don't remove it from the actual circumstances. What we're talking about here is the objective expectations of an investor in the 221D3 project and you can narrow it if you like to even the New Orleans area. But there's no difference, there's no record basis for suggesting the expectations in New Orleans are any different than the expectations in Seattle or Minneapolis where we have a perspective in a growing suburban area that says tax benefits are the reason to invest in this. So that's a distinction without a difference. But if you're supposed to be in the shoes of the particular investor, why is evidence of syndicators in totally different circumstances and totally different areas, why is that relevant? If there had been evidence introduced that people who are selling interest in Section 221D3 or 236 projects in San Francisco had a different expectation than people in Minneapolis or New Orleans. I think what Judge O'Malley is asking you is whether in considering the individual circumstances, you should consider somebody who doesn't syndicate separately from the run-of-the-mill people who do syndicate. In other words, whether the reasonable investor is a broad spectrum that includes both syndicators and non-syndicators or whether you should limit it to non-syndicators. Thank you, Your Honor. I had misunderstood. There's no reason that the benefits that are provided by the project, whether you hold the project yourself or you syndicate it, are going to be any different. The tax benefits, for instance, are going to be the same whether you hold it or you syndicate it. The syndications typically occurred when the developer didn't have the need for the tax shelter and so wanted to cash in on that by selling the tax shelter aspect of the investment to somebody else. So there's absolutely no distinction between someone who purchases property to hold it and someone who purchases property to syndicate it? I'm saying there's no difference in the returns that this kind of property would generate. That the fact that you syndicate, that you sell shares of it to others, doesn't affect where the money is coming from for the particular project. And so, you know, when you're talking about a reasonable investor in this sort of project, you know, the money comes from where the money comes from. Well, if you were going to consider an individual investor in this project, this investor only put $32,000 into this program, right? That's right. It was a very low, I believe it was 1.6 percent of the replacement value of the project as a whole. Far, far lower than what you would be putting into a project if you were developing it as a conventional project. That's one of the benefits that was expected and gained through participating in this project and one that was not interfered with by the preservation statutes. What about the contract issue? Well, the contract issue frankly is not properly before the court. What we had in the contract issue was a case that went to trial where the contract issue was not raised, an appeal to this court where the contract issue was not raised. Let's assume it was properly before the court. Why shouldn't we revisit that issue? Well, the issue is there's binding precedent on that issue first of all. So unless the issue were reviewed en banc sienic of four controls and there's no reason to review that issue en banc because I read the decision yesterday. It's a well-reasoned, cogent decision. It's consistent with federal common law. The plaintiffs offer the proposition that interpreting an agreement and here the agreement between the United States and CCA was the regulatory agreement. That's the only agreement between CCA and the United States. The other agreements were with other people. That's right. There was one between CCA, actually there were two. There was a mortgage and a mortgage note between the agreements and it was only in the note between CCA and its lender that there is a right to prepay. So CCA points to cases that say you interpret those agreements together and we don't disagree with that proposition. If there's a question about what the meaning of the regulatory agreement is, certainly you look at the whole context of the transaction. It's a fundamentally different proposition to say that in interpreting how the regulatory agreement is to be construed, you actually merge that with the mortgage note and the mortgage. Those documents were not incorporated by reference and the regulatory agreement was, as this Court held in Siena v. 4, a freestanding complete agreement. Absolutely no reason that it doesn't get enforced according to its terms and when you enforce it according to its terms, there's simply no prepayment right and therefore no privity between CCA and the United States. Do you agree that that conclusion is inconsistent with a number of decisions from our sister circuits who find that you don't have to have every single one of the documents signed by everybody to a tripartite agreement? No, I don't disagree that's in conflict with sister circuits. If you're talking about let me see if I can spell out what my understanding of the law is and that's that if you have an agreement between two parties or more than two parties where it is memorialized in separate writings for instance there are situations where you've got a letter making an offer and a letter coming back making changes and then a confirmation of that. You look at all those together and maybe all those different agreements between the three parties actually comprise the agreement. That's not the case we're talking about. That's not the sort of case we're talking about here. Here we have a freestanding whole agreement that is the regulatory agreement that has no right to prepay. We have a mortgage note that does not involve the United States that does talk about prepaying the mortgage. Well the mortgage is then guaranteed by the United States and the guarantee specifically addresses the 20 year right to repayment correct? The guarantee does not. All the guarantee says is that it's pursuant to the regulations that then set forth the right to prepay without HUD approval. It says pursuant to the regulations authorizing the United States to authorize the United States to enter into these sorts of deals to make the, to actually make the loan guarantees. Okay. Thank you Mr. Armstrong. Thank you. Thank you.